**UNITED STATES**

v.

**Travis SIMMS.**

**No. 3:07–cr–289 (MRK).**

United States District Court,
D. Connecticut.

Dec. 9, 2011.

### RULING AND ORDER

MARK R. KRAVITZ, District Judge.

Travis Simms has returned to this Court seeking the ancient writ of audita querela: an innovation from the time of Edward III that has lingered somewhat uncertainly into present-day American criminal law.

Mr. Simms invokes the writ in the hope that the Court will modify his sentence to counteract the State of Connecticut's refusal to allow his state and federal sentences to run concurrently, as this Court ordered in July 2011. Facing the prospect of serving several more years in prison than this Court—or perhaps any court—ever envisioned, Mr. Simms has asked that his federal sentence be reduced to time served and that he be handed over to the custody of the State of Connecticut to begin his period of incarceration there.

Unfortunately, the relief Mr. Simms seeks is beyond that which this Court has the power to provide. Because the Second Circuit does not allow the writ of audita querela to be issued for purely equitable reasons, Mr. Simms's Application for the Writ [doc. # 892] must be DENIED.

### I.

Mr. Simms was arrested on federal drug charges in February 2008, at which time he faced seven additional criminal charges in Connecticut. Although the federal government had (and has) primary jurisdiction over Mr. Simms, he was temporarily transferred to state custody in July 2008 for a hearing before Judge Burton A. Kaplan of the Connecticut Superior Court. On July 24, the day of his hearing, Mr. Simms accepted a deal in which he pleaded guilty to the pending state charges in return for concurrent sentences totaling five years' imprisonment. Judge Kaplan emphasized to Mr. Simms that once his state deal was completed he was "on [his] own to make [his] own plea negotiation with the Federal authorities, the U.S. attorney, the prosecutor and the Judge in Federal district court." Appl. [doc. # 892-1] (Hr'g Tr. July 24, 2008) at 10. Judge Kaplan made no mention of whether Mr. Simms's state and federal sentences should run concurrently or consecutively—presumably be-

cause no federal sentence existed at that point.

After he pleaded guilty to one federal count—possession with intent to distribute five grams or more of cocaine base—Mr. Simms was sentenced by this Court on April 14, 2009 to a term of 108 months in jail. The sentence was at the bottom of the Guidelines range then in effect for someone with a total offense level of 29 and a criminal history category of III—the category Mr. Simms would have fallen under had he delayed his state pleas, as his federal counsel urged him to do, until after his federal sentencing. *See* J. [doc. # 601] at 1. The Court did not specify in its 2009 Judgment whether Mr. Simms's federal sentence should run concurrently or consecutively to his previously imposed state sentence.

The Court was given an opportunity to address that issue, however, after the Second Circuit in March 2011 remanded the case back for further proceedings, clarifying as it did so that the Court "had discretion to impose a concurrent sentence, even though Simms's state sentence had yet to begin, because the sentence was (and remains) an undischarged term of imprisonment." *United States v. Gjini*, 419 Fed. Appx. 4, 9 (2d Cir.2011) (summary order); *cf.* 18 U.S.C. § 3584(a) ("[I]f a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively.").

On remand, the Court expressed its intent to make Mr. Simms's federal sentence concurrent with his state sentence and to reduce Mr. Simms's sentence from 108 months to 70 months because of the revisions to the Sentencing Guidelines for crack cocaine. At the resentencing hearing on July 14, 2011, the Court made clear: "I want my federal sentence to be fully concurrent with the state sentences so that Mr. Simms does not serve more time than he should." Hr'g Tr. (July 14, 2011) [doc. # 878] at 10. In response, Mr. Simms's counsel described logistical difficulties involved in running the state and federal sentences concurrently. Consequently, the Court announced its sentence orally on July 14 but refrained from entering its Judgment for two weeks so that Mr. Simms's counsel and the Government could determine how best to facilitate concurrency.

On July 27, 2011, Mr. Simms's counsel filed a letter proposing a way for the Court to ensure "a total federal and state sentence closer to the 70–month concurrent sentence it has imposed." Def.'s Sentencing Mem. [doc. # 874] at 2. According to the suggestion, endorsed by both parties, the Court would order that Mr. Simms be turned over to Connecticut's custody, where his state sentence would begin to run. The Court would further instruct the Bureau of Prisons to designate the state prison as the institution at which Mr. Simms would serve his federal sentence. *See id.* The Court's Judgment of July 28, 2011 includes these orders. *See* J. [doc. # 875].

Mr. Simms's strategy has not worked out as his counsel envisioned. Although the Bureau of Prisons attempted to comply with the Court's directives, the Connecticut Department of Corrections has refused to take custody of Mr. Simms until either a state judge issues a mittimus expressly allowing for concurrent sentences or Mr. Simms completes his federal sentence. Meanwhile, Mr. Simms's counsel has indicated to the Court that Judge Kaplan will amend the mittimus in Mr. Simms's case only with the prosecutor's consent—which officials in the State's Attorney's Office have so far refused to give.

The result is that Mr. Simms, who is scheduled to be released from federal pris-

on in March 2013, will have served sixty-one months in prison before the clock on his state sentence first starts ticking. In the worst case scenario, Mr. Simms will serve 121 months, rather than the 70 which the Court envisioned when it sentenced him. This Court's judgment that Mr. Simms should serve concurrent sentences totaling 70 months will have been thwarted.

Mr. Simms's proposed response is for the Court to issue a writ of audita querela, *see* 18 U.S.C. § 1651 ("[A]ll courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law."), in order to reduce Mr. Simms's sentence to time served. That way, Mr. Simms would be released to Connecticut's custody now—nearly forty-six months into his federal sentence—and the five years on his state sentence would begin to run.

## II.

The writ of audita querela, which dates from the fourteenth century, "was initially used by judgment debtors against creditors where the debtors had paid the debt and the creditors still tried to press the claims." Ira P. Robbins, *The Revitalization of the Common–Law Civil Writ of Audita Querela as a Post–Conviction Remedy in Criminal Cases: The Immigration Context and Beyond,* 6 Geo. Immigr. L.J. 643, 645 (1992); *see also* James Wm. Moore & Elizabeth B.A. Rogers, *Federal Relief from Civil Judgments,* 55 Yale L.J. 623, 659 (1946). Blackstone hailed it as "a writ of a most remedial nature, [which] seems to have been invented, lest in any case there should be an oppressive defect of justice, where a party, who hath a good defence, is too late to make it in the ordinary forms of law." 3 William Black-

stone, Commentaries *405–06 (quoted in Moore & Rogers, supra, 660).

Given Connecticut's attempt to press its claim even after Mr. Simms will have—in this Court's judgment—paid his debt to society, the writ's ancient origins have a certain resonance with the current case. But the King's Bench does not bind this Court as the Second Circuit does. And although "[t]he Second Circuit has not granted a writ of audita querela in the criminal context and has not, therefore, set forth any standards under which such a writ may be granted," *U.S. v. Persico,* Nos. 99 Civ. 4291(JFK), 84 CR. 809(JFK), 2000 WL 145750, *5 (S.D.N.Y. Feb. 7, 2000), it has at least offered a number of cautionary instructions as to what the writ in its modern form is not.

▮ To start: the writ is not dead. It "has been abolished with respect to civil cases, *see* Fed.R.Civ.P. 60(b), but it remains available in limited circumstances with respect to criminal convictions." *United States v. Richter,* 510 F.3d 103, 104 (2d Cir.2007) (per curiam). More specifically, the writ is not available unless "there was a legal defect in the conviction." *United States v. Tablie,* 166 F.3d 505, 507 (2d Cir.1999) (per curiam) (quotation marks omitted).

The verb tense in this last quotation masks the fact that audita querela traditionally targeted only defects arising *after* judgment. Authority both within and without the Second Circuit supports this. *See United States v. LaPlante,* 57 F.3d 252, 253 (2d Cir.1995) (noting audita querela's availability "where there is a legal . . . objection to a conviction *that has arisen subsequent to the conviction*" (emphasis added)); *United States v. Reyes,* 945 F.2d 862, 863 n. 1 (5th Cir.1991) ("While . . . *coram nobis* is used to attack a judgment that was infirm, for reasons that later came to light, at the time it was rendered,

*audita querela* was a means of attacking a judgment that was correct at the time rendered but which is rendered infirm by matters which arise after its rendition."); *United States v. Ayala*, 894 F.2d 425, 429 (D.C.Cir.1990) ("[T]he distinction between *audita querela* and other forms of post-conviction relief lies not in the *character* of the grounds for voiding the judgment, but rather in the *timing* of the occurrence of these grounds."); *Black's Law Dictionary* 150 (9th ed. 2009) ("A writ available to a judgment debtor who seeks a rehearing of a matter on grounds of newly discovered evidence or newly existing legal defenses.").

■ More relevant to the present case is the fact that the defect which arises must be a *legal* one. The Second Circuit, along with many others, has insisted that audita querela is not meant to provide equitable relief. In the Second Circuit's guarded description: "Audita querela is probably available where there is a legal, as contrasted with an equitable, objection to a conviction that has arisen subsequent to the conviction and that is not redressable pursuant to another post-conviction remedy." *LaPlante*, 57 F.3d at 253 (citing *United States v. Holder*, 936 F.2d 1 (1st Cir.1991)); *see also Doe v. I.N.S.*, 120 F.3d 200, 204 (9th Cir.1997) ("[A] writ of *audita querela*, if it survives at all, is available only if a defendant has a legal defense or discharge to the underlying judgment."); *Ayala*, 894 F.2d at 429 ("[T]he so-called 'pure equity' variant of *audita querela* finds no support in the historical definition of the writ."); *but see* Robbins, *supra*, at 647–48 (noting the considerable historical debate regarding the writ's equitable character); *id.* at 653–54 (discussing the rationale underlying many early American cases: that "audita querela relief was to be granted where the equities demanded re-

lief"). As the Seventh Circuit wrote in *United States v. Johnson:*

> Audita querela is not a wand which may be waved over an otherwise valid criminal conviction, causing its disappearance; rather, it provides relief from the consequences of a conviction when a defense or discharge arises subsequent to entry of the final judgment. The defense or discharge must be a legal defect in the conviction, or in the sentence which taints the conviction. Equities or gross injustice, in themselves, will not satisfy the legal objection requirement and will not provide a basis for relief.

962 F.2d 579, 582 (7th Cir.1992).

■ This is the obstacle facing Mr. Simms: the equities are undoubtedly on his side, since he faces a prison term significantly longer than what this Court envisioned when it sentenced him. But Mr. Simms has not identified any legal error in his sentence, nor has he raised a specifically legal objection to anything that has happened since the judgment. What he objects to are choices made after this Court's judgment by state officials in Connecticut. Lacking reason to believe that any of those choices are legally unsound, the Court cannot employ the writ on Mr. Simms's behalf.

The Second Circuit, following the Ninth, has explained why audita querela must not be used as a freewheeling source of equitable relief: doing so would raise serious separation of powers concerns. *See Tablie*, 166 F.3d at 507; *Doe*, 120 F.3d at 204. The Second and Ninth Circuit made this argument in the context of immigration, in cases where courts were asked to void previous convictions so that, years later, a defendant would not face unforeseeably severe consequences like deportation. Issuing the writ of audita querela in those circumstances would tread upon Congress's power to set deportation standards,

and the power of the Executive Branch to prosecute and pardon.

Here, the separation of powers argument cuts the other way—at least in one regard. In this case, the authority given judges—both federal and state—to sentence criminals is being frustrated by state executive branch officials. At this point, the length of Mr. Simms's sentence is effectively being determined by the Connecticut Department of Corrections and officials in the State's Attorney's Office.

On the other hand, Mr. Simms's Application raises separation of powers worries of its own. Employing the writ of audita querela, or any other extraordinary writ, in the way Mr. Simms has requested threatens to disrupt the carefully delineated power Congress has given the Federal Judiciary to modify a term of imprisonment once it has been imposed. *See* 18 U.S.C. § 3582(c); Fed.R.Crim.P. 35. If the writ of audita querela gave federal judges the power to modify sentences anytime something happened after sentencing that prompted an equitable objection, the narrow exceptions to finality detailed in 18 U.S.C. § 3582 would become pure surplusage. *See, e.g., United States v. Menasche,* 348 U.S. 528, 538, 75 S.Ct. 513, 99 L.Ed. 615 (1955) (noting courts' duty to "give effect, if possible, to every clause and word of a statute rather than to emasculate an entire section" (quotation marks and citation omitted)). Similarly, the strict time limits imposed by Rule 35(a) of the *Federal Rules of Criminal Procedure* would become irrelevant if courts could avoid them whenever the equities required as much. Why wait for a motion from the Director of the Bureau of Prisons, *see* 18 U.S.C. § 3582(c)(1)(A), or from prosecutors, *see* Fed.R.Crim.P. 35(b), if audita querela allowed courts to bypass such niceties? Courts for similar reasons have refused to allow audita querela to trump the statutory restrictions placed on post-conviction remedies such as 28 U.S.C. § 2255. *See, e.g., Carrington v. United States,* 503 F.3d 888, 890 (9th Cir.2007); *Pipola v. United States,* 430 Fed.Appx. 31, 32 (2nd Cir.2011) (summary order); *Reese v. United States,* No. 11–CV–3813 (SLT), 2011 WL 3648373 (E.D.N.Y. Aug. 17, 2011) ("[T]he statutory limits on second or successive habeas petitions do not create a 'gap' in the postconviction framework that could make audita querela relief necessary.").

In sum, the writ of audita querela may provide courts the authority to revisit a sentence if some legal error arises subsequent to the sentencing. But that is not the situation here. Here, a legally sound sentence was issued—one that actually incorporated the language Mr. Simms's counsel had requested. What has happened since is not legal error; instead, negotiations with the State of Connecticut have simply not turned out the way Mr. Simms, his counsel, and this Court anticipated.

## III.

Even after the writ of audita querela is set aside as a possibility, the question remains: what, if anything, can be done to make Mr. Simms's sentences run concurrently? The fact that the Court, at this point, lacks the power to modify Mr. Simms's federal sentence does not mean that Mr. Simms is out of options.

For one thing, Mr. Simms has an appeal currently pending with the Second Circuit, and a collateral challenge under § 2255 remains available to him. Should either succeed and resentencing be allowed, this Court—let it be clear—is fully willing to modify Mr. Simms's sentence in the way he has requested. If Mr. Simms wins on appeal, or if he can raise a convincing claim through a § 2255 Petition, the Court would happily resentence Mr. Simms to

time served so that his state sentence would begin and, ultimately, his total period of incarceration time served would remain close to the 70 months this Court envisioned. In that case, Mr. Simms's sentences would end up being effectively concurrent, even if not actually so.

The alternate—and likely more promising—way to bring about concurrent sentences lies with the State of Connecticut. Here again, the Court wants to be completely clear: it has no power, and even less desire, to tell the State of Connecticut what to do. *See, e.g.*, Hr'g Tr. (July 14, 2011) [doc. # 878] at 8 (noting the Court's resistance to calling other judges about their cases). The Connecticut Superior Court has no less power than this Court does to determine Mr. Simms's total sentence. Similarly, executive officials in Connecticut have every right to determine how Mr. Simms's state sentences will be carried out.

The only relevant distinction between Connecticut's courts and this one, when it comes to Mr. Simms's sentencing, is the fact that the Connecticut court sentenced Mr. Simms first and this Court got him second. This is a fact that matters, both according to federal law and according to Connecticut state law. *See* 18 U.S.C. § 3584 (allowing a judge to impose concurrent or consecutive sentences "on a defendant who is *already subject to an undischarged term of imprisonment*" (emphasis added)); Conn. Gen. Stat. § 53a–37 (granting the same power "when a person who is subject to any undischarged term of imprisonment *imposed at a previous time*" by a Connecticut court (emphasis added)). The United States Solicitor General has recently provided a convincing explanation of the power given to later-sentencing courts—whether federal *or* state:

> When a defendant is sentenced on a later charge before he completes his sentence on an earlier charge, the second sentencing court can take full account of the defendant's background, character, and conduct. Those considerations include his previous offenses and his undischarged term for previous offenses.
>
> ... The second sentencing court knows the facts that the first sentencing court, looking into the future, could not know for certain: the nature of both offenses; the fact that the defendant was convicted of both; the degree of factual overlap between the offenses; and any changes in the defendant's situation after the first sentencing....

Brief for the United States at 27–28, *Setser v. United States*, No. 10–7387, 2011 WL 3678808 (U.S. Aug. 19, 2011). The Solicitor General went on to observe that, in addition to these considerations, the second-sentencing court may also "out of comity, give weight to the first sentencing judge's view" as to concurrency. *Id.* at 29.

In this case, the first sentencing court—the Connecticut Superior Court—did not express a view about concurrency. This was entirely proper. In fact, before this Court realized that Mr. Simms had already been sentenced in State Court, it too refrained from suggesting whether concurrent or consecutive state and federal sentences would be more appropriate. *See* Hr'g Tr. (July 14, 2011) [doc. # 878] at 6. Once the Court took Mr. Simms's state sentence into account, however, it was able to determine the effect his state convictions would have on the federal Sentencing Guidelines, as well as the overall term of imprisonment (state *and* federal) that would best promote the goals of sentencing, expressed at 18 U.S.C. § 3553(a).

In particular, the Court emphases—as it did at the time of resentencing, *see* Hr'g Tr. (July 14, 2011) [doc. # 878] at 13—that Mr. Simms's state crimes were reflected in

the federal sentence he received. Because Mr. Simms's was assigned criminal history III, the applicable Sentencing Guidelines range for his federal crime was 70–87 months. Were it not for his state crimes, his guidelines range would only have been 57–71 months. In other words, Mr. Simms's state crimes produced a significant enhancement in what—given the lingering disparities in crack cocaine sentences—was already a significant prison term. Upon resentencing, the Court found that adding an additional 60–month state sentence on top of the federal sentence would go well beyond the punishment appropriate for Mr. Simms's crimes. Seventy months in prison was, in this Court's considered judgment, an appropriate sentence for Mr. Simms's convictions, both state and federal. The Court imposed its sentence with full awareness of, and respect for, the sentence previously imposed by the Connecticut Superior Court.

Its judgment now made, the Court in no way presumes to direct the choices Connecticut's judges and executive officials will make going forward. Those choices are theirs. But insofar as their choices are guided by comity—and by deference to the role both Connecticut and the federal government have chosen to afford later-sentencing courts—it is important that all parties understand the intentions that guided this Court's sentencing decision. This Court sentenced Mr. Simms to 70 months imprisonment with the intent that his federal sentence would be served concurrently with that imposed by the State of Connecticut. The Court maintains hope that this still may happen.

## IV.

The familiar challenges of our federalism, with its dual sovereigns, have caused the problem Mr. Simms now faces. Only Connecticut can solve the problem, since the federal courts have such limited ability to modify sentences once made. The Court would say that its hands are tied here, were that metaphor not unseemly when talking about a person in *actual* confinement—the duration of which is now out of the Court's control. The Court can only express its hope that as Mr. Simms pursues other avenues of relief, a spirit of comity will prevail upon those who do have the power to affect his sentence.

Mr. Simms's Application for Writ of Audita Querela is DENIED.

IT IS SO ORDERED.